Our first case is John M. Sweeney v. Alcon Laboratories, No. 20-2066. Mr. Myers. Thank you, Your Honor. Chief Martin Myers, appearing for the plaintiff's appellants, John and Regina Sweeney. And I'd like to reserve two minutes for rebuttal, if I may. Granted. May it please the Court, it is both fitting and an honor to be involved in the oral argument of an appeal like this one within steps of the Independence Hall, where the case involves a fundamental bedrock principle of our entire judicial system, such as due process of law. And this appeal raises an important and fortunately unusual question, which is when a Chapter 11 bankruptcy debtor violates one of the fundamental requirements of bankruptcy law by failing to complete a diligent review of its own books and records to uncover all potential claimants against it and claims a review which would have revealed the existence of almost 50 prior lawsuits involving precisely the same product that caused devastating injuries at issue in a case later brought against it. And then, as a result of its failure to complete the diligent review required, the debtor ignores those claims completely. In the bankruptcy bar date notices, it circulates. All right. So the claim revolves around the notices, right? Correct. We've got a couple of papers of national circulation and one up in Rochester, correct? Correct. As I understand it, you're not arguing, are you, that it was improper to publish the notice of the bar date in those particular... That's exactly correct, Your Honor. The issue here is not the manner of notice. It's the content. It's the content. Okay. This is not about the timing of the notice or other procedures. Your claim is these should have been more specific. Correct. Okay. And how do we... Do we pronounce this pantopaque or... That's correct. Okay. And what you are claiming is that the due process clause required that that notice sort of put out a beacon to folks who might have had problems as a result of the pantopaque. Whereas in this case, there is substantial evidence of the existence of potential claims from prior lawsuits, almost 50. And by the way, including actually almost 75 different claimants, because one of those lawsuits, the Abbott case, which appears from the very first page of that case, involved 25 plaintiffs in that case alone. So we're talking about a total of almost 75 claims brought against Kodak. 40 years, evidence in its own books and records of 40 years of Kodak manufacturing the key ingredient in this product. Yep. But counsel, let me make sure... I'd like to ask you, counsel, you're talking about having a greater degree of specificity. What is that based on? And what exactly would you have wanted the publication notice to say? Well, your honor, what is... I'm sorry, your voice is... Judge Greenway seems to be still talking and I can't hear his voice. But I think what he's asking... Let's go back to Judge Greenway. Can you try again? The audio cut out a little bit, Judge Greenway. No worries. Happy to repeat the question. Is that better? Did you hear what I just... Yes. But my question is this, it appears that you're asking for a greater degree of specificity in the publication notice. And my question to you is, number one, what is that greater degree of specificity based on? And number two, when you have a company like Kodak, which has many lawsuits in many different areas, are you asking us essentially to change the way in which publication notices are made? Because if it's good for Pantopaque, I presume others similarly situated will say in future notices, we want that degree of specificity. Your honor, in fact, if you look at the relevant case law, you will find already that this is a process that is being filed where, as I said before, there is substantial evidence in the debtor's own books and records. And there is not just one or two, but a substantial number of prior claims. For example, let me read from a quote from the Shemtora bankruptcy case that was quoted and relied on heavily by Kodak in this case. This is actually from an earlier ruling, a published ruling at 505 BR 427. At page 431, the court is talking about another form of claim besides the benzene claims in the Shemtora case that Kodak is trying to direct the food flavoring substance that had been sold just for seven years by Shemtora. Here's how the court described Shemtora's bankruptcy notice and what it said about the diacetyl claims. Shemtora had sold diacetyl to food flavoring companies throughout the United States from 1998 to 2005. Shemtora bankruptcy bar notices advise potential claimants that if you were exposed to diacetyl, and if that exposure directly or indirectly caused injury that becomes apparent either now or in the future, you may have a claim under various legal theories for damages. Through the combination of these statements, Shemtora put potential diacetyl claimants on notice that one, they might have been exposed to diacetyl while working at the plant. Two, they might have been injured by that exposure. Three, they would have a claim even if their injury had not yet manifested itself. And four, they would lose their rights to recover on that claim if they did not file a proof of proof of claim by the bar date. Sir, can I specify? So the wording you are asking us to say, they should have said is, if you are or may have been exposed to pantopaque and suffered injuries as a result, you may have a claim against the Kodak Corporation. You want something functionally equivalent to that. Maybe not the precise words, but some paraphrase of that. Functionally equivalent to what I just read. I have a couple questions. The first one is, obviously Shemtora didn't say that's required. They said that was sufficient. The second one is the Kemptora decision is not a binding decision upon us. This is a bankruptcy court decision. That's correct. But it's not, it might be persuasive, but it's not binding. That's absolutely. Okay. So we would have to extend existing law. You're not aware of any binding precedent from the Supreme Court or the third circuit that says that such wording is required, right? No. Do you have any court of appeals that has said such wording is required? No, but, but if you, if you look at the Grossman's factors that this court carefully considered and carefully established, and you analyze those factors from the standpoint of due process of law, you see overwhelming support for the conclusion that in this case, there was not due process. Can I ask another question? So your client was diagnosed with, how do you pronounce it? Arachnoiditis? Yes. In 2014. Correct. And upon being diagnosed, your client did some research and only then learned that he had probably been injected with Pantopaque. Correct. No. Your client had not, did not know the word Pantopaque, didn't know what it was. He learned about it after the 2014 diagnosis. That's correct. But by then the bankruptcy had already been consummated. So how would a notice that mentioned a chemical Pantopaque in 2012 have helped your client who didn't know anything about this until 2014? Where's the causal connection between that, your client, the injury to your client? Your Honor, the law in this area is clear that when there is a pre-petition claim, the notice that is provided by the debtor must include information that provides the best reasonable and most practical. Yes, for you to recover there has to be, excuse me, there has to be a causal connection. Okay, and here's the, no there doesn't, I disagree with the court respectfully on that point. The, what has to be shown, for example, there's no way we can tell that Mr. Sweeney's prior physicians would not have seen that note, if that notice, if it had mentioned Pantopaque and called up Mr. Sweeney and said, hey, you know, John, you're one of the people that may be involved here or somebody else who knew about his circumstance. So we can't discount that. Is there anything in the record that would tend to suggest that by any of his physicians or anything else? That he has the arachnoiditis? That if a publication had been made that one of his physicians, it would have said, well, that looks exact, because the symptoms from 2009 on, that looks exactly like what Pantopaque. Your Honor, with all due respect, the question you're about this entire area of the law, the court, and even in the, all of the asbestos cases, most of those, that language, provision was made for future claimants when there was latent injury, when it was known that there was latent injury. But you haven't pleaded that. Your claim is about the quantity of the notice. You never preserved, you never argued, you never pleaded that there was latent injury. Yes or no? Did you argue and preserve this in the district court or in the bankruptcy court in your briefs before us? Well, Your Honor, I believe we made the argument that there should have been a trust. Where? I'm not sure exactly. I don't see it anywhere in your brief. Well, I think when we discussed the Grossman's factors in the 524G trust, we disagreed with the court. And I believe we argued to the district court that there should have been a trust. Can you show me anywhere in your appellate brief where you have preserved that issue? You can find it in time for rebuttal. If you don't know it now, that's okay. But I didn't see that argument anywhere. Okay. Well, I believe we, I'm almost certain we made that in the district court. And I believe we touched on it here, but we may not get the citations in time for rebuttal. I don't want to waste your time now. Okay. All right. In any case, Your Honor, I want to follow up on something you said, Mr. Myers, because you talked about the asbestosis cases. This is not a mass tort case, right? Well, that depends on your definition, of course. I mean, there are 75 claimants. We don't know, unlike the Johns Manville case, which incredibly Kodak has the audacity to attempt to rely upon, where there was an entire publicity campaign engaged in, a national newspaper, national television. But the reason for that is the asbestosis claims bankrupted the company. That's why I say this is nothing like that. No, understood. I'm not suggesting that there was only one case, but are you disagreeing with my understanding? You're free to. We don't know how many claims there were out there because it was never publicized. Let me ask the question. Do you disagree with my understanding that this is not a mass tort case? Do you say I'm mistaken about that? It is a mass tort case. Yes, I disagree with that. Please tell me why this is a mass tort case and why this case is like Johns Manville and other mass tort cases. It's a mass tort case because Pantopaque was injected into the spines of millions of Americans. That's not disputed by Kodak. They engaged in the manufacture and we know of almost 75 people in this country who brought claims, and that's what we're hearing from Kodak and the published cases. We don't know how many brought claims that never reached the point of a filed lawsuit. We know that in other countries, there have been of the danger of this product. It was taken off the market because of its danger. We have right in our complaint, which is in our appendix, the court can read about how Kodak spent years attempting to avoid the disclosure of this danger to the FDA and to various other measures and failed over that entire 40-year period to warn people. And back injuries are the types of injuries that can have numerous causes. So people can suffer like Mr. Sweeney did for years with this type of an injury before finally discovering, oh, it was that dye that was injected into my back 30 years ago or 20 years ago or however long ago it was. And this is similar to the latency periods in asbestos litigation and a provision needs to be made in the law for this type of latent injury, especially, and it needs to be addressed under due process of law principles, especially when a debtor has substantial evidence in its own books and records and every single one of the cases that have been cited by all the parties in this case. Okay, I think we, go ahead, Judge Greenaway. Oh, thank you, sir. Question. Do you allege in your complaint that Kodak had knowledge of the potential pantopaque planes? We do. And that knowledge is evident from a declaration provided by Kodak in opposition to the, or in support of its motion to dismiss in the court below, where they revealed that they had the 45 prior lawsuits against it, against them, that when you count the published cases, they forgot to mention it's 48. And again, when you count the fact that there was 25 plaintiffs in one of those lawsuits, yes, Kodak was well aware. And we allege in our complaint that they knew as early as 1945 of the dangers of pantopaque and never revealed those dangers to anyone, just like they never revealed them to the bankruptcy court. So here's a whole body of evidence that was never before the bankruptcy court in this case, because Kodak never thought to mention it or to bring it to the attention of the bankruptcy court. I think we understand, Mr. Myers, if you get a chance to try to answer Judge Beavis's question on rebuttal, the court would appreciate that. But I think we appreciate that you're arguing both not the manner of distribution of the notice, but what was in the notice and also based on what you've been arguing, there would need to be provision made for future claimants the way they've done in mass tort cases. That's correct. Okay. All right. We'll hear you on rebuttal. Thank you very much. Let's hear from Mr. Ward. Good morning, and may it please the court. I'm Eric Ward for Kodak. Let me start, if I can, please, with a theme I think that the court has already expressed, and that's the question of whether this is a mass tort and whether Kodak's bankruptcy arose from mass torts, such as many of the asbestos cases that are out there and are referred to in the briefs. Mr. Myers has already indicated that there were millions of people across the country or the world who got Pantopec, who were injected with Pantopec, and we know of, according to him, 75 such claims. This bankruptcy was not involved in trying to get out from under litigation like, for example, W.R. Grace or Johns Mansville, and I would also point out that one of the cases that was just cited by Mr. Myers, the Kemchura case in the diacetyl, that is very significantly different because, in that case, part of Kemchura's bankruptcy was to put a close to litigation involving diacetyl. In fact, there was a trust. There were 237 claims in that case. There was a trust that was established of $65 million to pay those claims. Here, we have a situation where Kodak had not had a Pantopec, and we're calling it Pantopec, but Kodak actually manufactured a chemical called Iofentanil, and it was a component of Pantopec, which Kodak sold to Alcon, Alcon's predecessor, and it was Alcon then who formulated Pantopec using Iofentanil in it. So, the circumstances of all these cases are quite different, and Judge Greenaway, you raised a question that was similar to what Judge Salas said in the district court, which is, where does it end? So, Kodak, at the time, manufactured hundreds of chemicals. Did Kodak have an obligation in its bankruptcy to go back and look at each of these chemicals and then list potential damage from those chemicals? Were there any other chemicals that resulted in 48 lawsuits or lawsuits involving 75 plaintiffs? There were. It's not in the record, Your Honor. We did not raise that as part of the record, but yes, indeed, there were. Humor me a little bit with a hypothetical. At some point, if one of those chemicals manufactured by Kodak created sufficient litigation, it would seem logical to presume that the notice should mention that chemical in the bar date notice. I suppose, depending upon the circumstances. But where do we draw the line? Is it 50 cases? Is it 5,000 cases? You know, the easy cases are Johns Manville, W.L. Griffith. This is a type of claim that wipes out a company. Correct. And that's easy in terms of disclosure. That's easy in terms of providing for future latent claims, right? Correct. So where do we draw the line? Well, I think that you have to look at the circumstances on that because, you know, due process involves a degree of reasonableness. And I think the Mulane Court was very clear on that. The unfortunate fact here is that notice by publication is not the best. It's not going to get to everybody. I think that that's certainly recognized. It's the best we have, but it's not going to get to everyone. And I think in those circumstances, Judge, if you're going to go back and look and require specific notices, you have to involve the circumstances of the case. Here we had less than 50 cases. The last one commenced in 1997, 15 years before the bankruptcy, on a chemical that the company had stopped manufacturing in 1987, 25 years before its bankruptcy. So I would say that in terms of reasonableness, that doesn't add up to the way that a bankrupt company should have to go back and look. I mean, to answer your hypothetical, I think that there's something that could be even more apparent. What about a warranty claim? In December of 2011, right before Kodak declared bankruptcy, it sells 10,000 printers, right? And it sells them through retailers. It doesn't know who got them. So should its bankruptcy notice say, and oh, by the way, you may have a breach of warranty claim? I think that that would turn on its head the way notice has worked, which, according to the Mullane Court, has to be specifically to the statute that is being noticed about. In our case, it's the bankruptcy statute that is being noticed here. Counsel, let me ask a question. I know you're turning to the voice. But my question is this. Let's just stay on the hypothetical theme for a moment. Let's say Kodak had known of the existence of a category of potential Pantopaque claims in 2012, obviously a permutation of what the facts are here. In that instance, would Kodak have been obligated to identify its connection to Pantopaque in the publication notice? I would argue, Your Honor, it would not have had an obligation to do that. Because the way that you've described it, and as I understand it, those are contingent claims, perhaps that may come to roost. But the same thing is true with a warranty claim. And I don't think that unless there is something actual about this, you know, this question of specificity in the notice, it really does... Excuse me, let me just step back. The question of specificity in a notice, in a case in which litigation is not the reason for bankruptcy, is generally found to be publication of the bankruptcy. And in fact, this court, in a case called Chemitron, it's a 1995 case, went so far as to say, under similar circumstances as we have here, that once it was determined that the plaintiff was a prepetition unknown creditor, then it followed very easily that constructive notice of the bankruptcy was sufficient under those circumstances. And I think that to hold otherwise in this particular case would involve having to explain away the findings in that Chemitron case. So I understand you, your line drawing in response to Judge Partiman's question is really mass tort on the one hand, and everything else on the other? You've got to draw lines, help us out. You know, your honor, I think that that would be certainly one consideration. But there are other considerations too. For example, how long ago were these mass torts? When was the last one? How many, when we say mass tort, what does mass tort mean? How many claims did there have to be? I think that this is a situation that would call for some judgment that's involved. And of course, like the court did in the Grossman's case, I think that the content of the notice would have to be subject to certain criteria and factors to look at. We don't have any law on that. And as a result, I think that what we have to look at is what the Supreme Court said in Mullane about constructive notice, which really hasn't been changed since the 50s when that case came out, and what this court said in its Temetron case. Under that rubric, if it's not a mass tort, the bankruptcy code is really going to visit an injustice upon people with latent claims, right? Isn't that the upshot of your argument? That is the upshot of the argument. I don't think that we can sugarcoat that in any way, Your Honor. Right. So people who get sick earlier are going to have a recovery, and people who get sick or manifest itself five years later get nothing. That's what the bankruptcy code requires. I think it does. I mean, the whole point of the bankruptcy code is to give the debtor a fresh start. Except that due process imposes some constraints there. And we've recognized repeatedly in EFH, Wright v. Wentz-Corning, Grossman's, and Jones v. Temetron, that there may be a role for setting aside some, you know, having a representative appointed who can at least argue for setting aside some money. And, you know, if you ask us to draw a hard and fast line, what's a mass tort, we have to come up with a number. But if we just set out a standard that requires the district to consider whether to have a personal representative, then it's going to depend on, you know, doing some actuarial calculations, what you knew, what you reasonably should have known. Why isn't that the way in which due process imposes a constraint? We've suggested it repeatedly. Because I think that in the circumstances of this case, the facts don't rise to that level to make that consideration. Look, the other thing that we have going on here is that in 1991, and this is in the record, in 1991, Kodak gave all of its documentary evidence about the manufacture of iophendylate to Alcon. It had none. What it did have was some records in its health and safety department about the existence of lawsuits. That's the only source of information we had. Because by the time that Kodak filed for bankruptcy in 2012, there wasn't even an employee left at Kodak who had anything to do with the manufacture of iophendylate. So its knowledge base is actually quite slim. And that has to do with the timing of these cases. We don't have a great record on this, right? This wasn't developed. Well, Your Honor, I would point you to the Grykowski affidavit in which she made those statements. So great record? I agree. Not a great record. A record? Yes. But your point is, is that the paralegal? Yes. Your point is the reason there's a thin record is because this was a non-issue for the company. The company had a lot of other issues that put it into bankruptcy that had nothing to do with I'm not going to take up any more of your time unless the court has specific questions. Let's see if Judge Greenaway, anything further for Mr. Ward? Thank you, no. Thank you. Okay. Thank you, Mr. Ward. Thank you very much. Let's hear Mr. Myers on rebuttal. Thank you very much, Your Honor. First of all, let me address Judge Bevis' question. We did not state that there should have been in this brief because it was really not necessary. What we were trying to point out was the fact that the 524G trust was not the only part of that sixth gross mid-factor. There were other circumstances that the court did not consider. But we did make the point that Kodak was well aware from both the published and unpublished cases of the latent nature of the injuries here. For example, we point out that in the Staub case, which is one of the published cases, there was a latency period of something like 22 years. In the Dora case, there was a latency period of something like 18 years. So we certainly preserved our right, I would submit, to talk about the need to consider latent injuries here. Secondly, counsel has really misrepresented to the court with all respect the ruling in Shem Torah. And I want to quote something which shows the court that this is not nearly as complicated or unusual what we're requesting as counsel is attempting to make it. It says on page star 13 of the very opinion that he cited, as of the bar date, the debtors had no knowledge of any potential benzene exposure claims relating to WITCO mineral spirits used by safety clean. Had no knowledge of those, that specific type of benzene claim. Although 14 of the site-specific notices identified benzene as a potential contaminant at or near specific facilities where it was used as a raw material, none of them identified benzene contained in WITCO mineral spirits or used in safety clean parts washing machines and solvents as a potential contaminant. So the point is, 14 different notices mentioned benzene because those were the ones that the debtor knew about from its own books and records. There's where the line is that needs to be drawn. Now the debtor, as they pointed out in Shem Torah, the debtor had no knowledge whatsoever of benzene claims related to its ownership of safety clean because safety clean was a subsidiary that had recently purchased. So under that theory, if Kodak manufactured thousands of products, let's say they manufactured 10,000 products and they had litigation in 5,000 of the products, your argument is that the notice should have contained a statement about all 5,000 of those products because you've got to make sure that if there's somebody out there with a latent defect, they can go through the list of the 5,000 products and see if that was one that they experienced. Your Honor, what the court is suggesting is an approach of reasonability and we're not, but we don't have a record in front of us that shows that Kodak was sued with respect to any of those chemicals based on injuries they caused or exposure to those chemicals or latent injuries involved. We don't have anything in the record about other latent injuries. No, but we do have a record of, for a big company, what is really sort of a remarkably modestly small number of cases over a 40-year period, right? You said if this was sent out to millions of people and there are 75 plaintiffs, that's not something that would typically be cause for concern to a general counsel of a large company, right? Your Honor, we have something today known as Westlaw, and I'm not being facetious to the court or disrespectful in saying this, but I want to just bring something to your attention because I think the court can take judicial notice of this. Even a large company like Kodak can put something like products liability and Kodak into Westlaw, and I think the court would be surprised to find that all that would come up is about 100 different cases. There's no great burden on a debtor to go through 100 cases and find a case like Staub, which, by the way, mentions mass tort and class action litigation in connection with with panel pay. That's mentioned right in the Staub case. So there's a published case that has to bring a special red flag to the mind of a good faith debtor who recognizes its obligations to perform a diligent review and reasonable review of its own records. And by the way, I would point out the DPWN case that we cited that took place in the Second Circuit. That was not a mass tort case. That was something completely different, and I don't think there's any evidence that the diacetyl claims or even the benzene claims that were at issue in Shem Torah were mass tort claims. So this is a court case. Excuse me, Your Honor? DPWN is a district court case. It's a district court case that was that was that appeared apparently was affirmed by the Second Circuit. There's a Second Circuit opinion that never even questioned that part of the ruling. It did remand the case on other grounds, but it never even questioned the district court's ruling on that part of the case, which held that the bankruptcy bar date notices were inadequate. So again, this is far more widely and far more easily applied than Kodak is making out. And I think as a court properly observed, there is no record here from which we can start making inferences in favor of Kodak on this issue. I understand they have thousands of chemicals that they might have produced, although most almost all of those chemicals were in the area of photographic equipment. I don't know of any other medical product that Kodak ever produced. So again, the effort here is being to make this so complicated and unreasonable. And I would submit to the court that there's nothing in the record that warrants that type of an inference. In fact, everything in the record warrants the opposite inference. They had no problem coming up with this information about these cases to support their motion to dismiss. That was easy. Where was the difficulty? So again, we know that a reasonably diligent review of their own records, which they admit that they have, and they can characterize it any way they want, but that declaration of Esther Grakowski admits that they had extensive records. And they had a huge 40-year... In Shemtora, those diacetyl claims were... manufactured by Shemtora over seven years. Here we have a product manufactured by Kodak over 40 years. Are we going to say that there were thousands of medical products manufactured by Kodak over 40 years? I don't think so. All right. Thank you very much, Mr. Myers. Thank you, Mr. Ward. Court will take the matter under advisory. Thank you very much.